IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GIPSY PEREZ,                    :
                               :
            Plaintiff          :    CIVIL No. 3:12-CV-01713
                               :
        vs.                    :    Hon. John E. Jones III
                               :
CAROLYN W. COLVIN, ACTING      :
COMMISSIONER OF SOCIAL         :
SECURITY,                      :
                               :
            Defendant          :

**MEMORANDUM**

**February 10, 2014**

**BACKGROUND**

       The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Gipsy Perez's claim for social security supplemental security income benefits.

       Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

       Perez protectively filed[1] her application for supplemental security income benefits on April 13, 2009. Tr. 25, 128-130 and

---

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

155.[2]   The application was initially denied by the Bureau of Disability Determination[3] on August 12, 2009. Tr. 25 and 103-107. On October 15, 2009, Perez requested a hearing before an administrative law judge. Tr. 108-110.   After over 8 months had elapsed, a hearing was held before an administrative law judge on June 22, 2010. Tr. 65-100.   Perez was represented by counsel at the hearing. Id.  On July 23, 2010, the administrative law judge issued a decision denying Perez's application. Tr. 25-32.   As will be explained in more detail *infra* the administrative law judge, after considering the medical records and the testimony of Perez and a vocational expert, found that Perez could perform a limited range of unskilled, sedentary work,[4] specifically the jobs of ticket

---

[2]References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on November 2, 2012.

[3]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration.   Tr. 104.

[4]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more

2

taker, video monitor and telephone receptionist. Tr. 31 and 96.

On August 31, 2010, Perez filed a request for review with the Appeals Council of the Social Security Administration's Office of Disability Adjudication and Review, and on July 5, 2012, the Appeals Council concluded that there was no basis upon which to

---

than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work.*  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work.*  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work.*  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 416.967.

3

grant Perez's request for review. Tr. 1-5, 17 and 184-185.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Perez then filed a complaint in this court on August 28, 2012.  Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on February 1, 2013, when Perez filed a reply brief.

Perez was born in the United States on January 1, 1982, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 416.963©. Tr. 101, 128 and 142.

Perez stated in documents filed with the Social Security Administration that she withdrew from school after completing the 11th grade in 1998. Tr. 153. Perez during her elementary and secondary school attended regular education classes although in the Spanish language. Tr. 91.  Perez is able to speak English but is functionally illiterate with respect to reading and writing English. Tr. 75-76 and 147.  Perez is, however, able to read names

---

[5]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

[6]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing and the decision of the administrative law judge, Perez was 28 years old. Tr. 72.

and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 76-77, 91-92 and 176. After withdrawing from high school, Perez did not complete "any type of special job training, trade or vocational school." Tr. 153. Perez's preferred language is Spanish, but she stated at the administrative hearing that she did not need an interpreter, and she testified in English. Tr. 68 and 147.

Perez has a very limited work and earnings history. Tr. 143 and 181. The records of the Social Security Administration reveal that Perez had earnings in the years 2004 through 2007 and 2009. Tr. 131 and 143. Perez's reported annual earnings ranged from a low of $823.50 in 2007 to a high of $11,369.00 in 2004. Id. Perez's total earnings during those 5 years were $16,408.47. Id.

A vocational expert described Perez's past relevant employment[7] history as follows: (1) a warehouse worker, unskilled, medium duty;(2) a fast food worker, unskilled, light duty; (3) a mail handler, unskilled, light duty; (4) a file clerk, semi-skilled, light duty; and (6) a handpacker, unskilled, medium duty. Tr. 30 and 88-89.

---

[7]Past relevant employment in the present case means work performed by Perez during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

Perez claims that she became disabled on November 1, 2008, because of back problems and a curved spine. Tr. 147. Perez alleged that she could not walk "for long periods of time," she could not stand or bend over, and she had problems sleeping because of the pain in her lower back which traveled to her feet. Tr. 148. Perez had spinal surgery in December, 2009, and at the administrative hearing claimed that the surgery did not relieve her pain and she suffers from lumbar radiculopathy, post laminectomy syndrome and lumbar degenerative disc disease. Tr. 70-71. Perez did not work during 2008, and worked part-time in 2009 until February 15th when she was "laid off." Tr. 148. Perez's earnings during 2009 did not rise to the substantial gainful activity level. Tr. 27.

The alleged disability onset date of November 1, 2008, has no impact on Perez's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See C.F.R. § 416.501. As stated above Perez's SSI application was filed on April 13, 2009. Consequently, Perez is not eligible for SSI benefits for any period prior to May 1, 2009.

During her testimony at the administrative hearing and in documents, including a "Function Report - Adult," filed with the

Social Security Administration, Perez indicated that she lives with her children ages 10 and 11; she has difficulty with some personal care such as dressing and combing her hair but she is able to care for her children including preparing them meals; she needs no special reminder to take care of grooming or to take medicines; she is able to shop for items in stores; her hobbies include reading and watching TV everyday;  and she does not use a TENS unit, back brace, cane or other ambulatory device.  Tr. 81-82 and 174-177. In the "Function Report - Adult" completed by Perez when asked to check items which are affected by her illnesses or conditions did not check the following: talking, hearing, seeing, memory, concentration, completing tasks, understanding, following instructions, using hands and getting along with others.  Tr. 178.

For the reasons set forth below we will affirm the decision of the Commissioner denying Perez's application for supplemental security income benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

7

findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).   Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001);  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

      Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008);  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213.    In an adequately developed factual record

8

substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966). Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

9

lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work. For
> purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in

evaluating supplemental security income claims. See 20 C.F.R. §

416.920; Poulos, 474 F.3d at 91-92. This process requires the

Commissioner to consider, in sequence, whether a claimant (1) is

engaging in substantial gainful activity,[8] (2) has an impairment

that is severe or a combination of impairments that is severe,[9] (3)

------

[8]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

[9] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe

has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular

_____

impairments, the evaluation process continues. 20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

[10]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[11]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.   Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Perez's medical records.  However, initially we will note that prior to, at, and after the administrative hearing counsel for Perez did not submit a functional assessment from a treating or examining physician indicating that Perez could not work at the modest exertional level set by the administrative law judge in her decision dated July 23, 2010.

There is no medical documentation contained within the administrative record that predates the alleged disability onset of November 1, 2008.  The first record we encounter is from December 18, 2008. Tr. 246-250.  On that date which was less than two months after the alleged onset date Perez had an appointment with Kharmen Lopez, M.D., and Gretta Gross, D.O., who were affiliated with the United Health and Hospital Services, Inc., Wyoming Valley Family Practice Residency, Family Care Center,

located in Kingston, Pennsylvania, for a general female physical examination and for complaints of dyspareunia.[12] Id.  The record of this appointment states that Perez last visited a physician 5 years prior to the appointment and was "unable to say" what precipitated the present "check up" but did state that she suffered from dyspareunia for 3 years. Tr. 247. When the examining medical provider reviewed Perez's systems,[13] all systems were negative, including Perez denied musculoskeletal, neurological and psychiatric problems. Id.  The results of a physical examination were normal. Tr. 248.

Three months later, on March 19, 2009, Perez had an appointment with Binalkumar Ladani, M.D., who was affiliated with the United Health and Hospital Services, Inc.,[14] regarding low back pain and a "pinching feeling in the right leg." Tr. 223-224.  Perez reported that her pain was a 5 on a scale of 1 to 10 and she had

---

[12]The record indicates that the appointment was for a "NP physical," a "well woman exam" and dyspareunia. Tr. 246 and 248. An "NP physical" is a nurse practitioner physical.  However, the record indicates that Perez was seen by "khl" who is Dr. Lopez and that Perez "was precepted with Dr. Gross." Tr. 247 and 250. Dyspareunia is defined as "difficult or painful sexual intercourse." Dorland's Illustrated Medical Dictionary, 579 (32nd Ed. 2012).

[13]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed February 6, 2014).

[14]All of Perez's medical providers appear to have been associated with United Health and Hospital Services, Inc.

back pain since November of 2008. Tr. 223. This was the first time that Perez reported back pain to a medical provider and she reported no recent injury. Id. A review of systems was negative except for the reports of low back pain and the results of a physical examination were normal except for muscles spasms on the right side of the lower back. Tr. 223-224. Perez was noted to be ambulatory and did not have an "emaciated/wasted appearance." Tr. 223. Furthermore, her spine was described as "normal without deformity or tenderness." Tr. 224. Dr. Ladani's diagnostic assessment was that Perez suffered from a "[l]umbar sprain/strain" and he prescribed Motrin and the muscle relaxant Flexeril and referred Perez to physical therapy. Id.

On March 20, 2009, Perez had a series of x-rays of the lumbar spine which revealed mild levoscoliosis[15] but otherwise the x-rays were unremarkable. Tr. 187. On March 26, 2009, Perez had additional x-rays of the lumbar spine which revealed the following: "Straightening of the lumbar lordosis[16] probably related to muscle spasm. There are no osseous abnormalities. Normal disc spaces.

---

[15]Scoliosis is "an appreciable lateral deviation in the normally straight vertical line of the spine." Dorland's Illustrated Medical Dictionary, 1681 (32nd Ed. 2012). Levoscoliosis is a type of scoliosis where the curvature of the spine is to the left. Levoscoliosis, http://levoscoliosis.net/ (Last accessed February 6, 2014).

[16]Lordosis is the normal concave curvature of the spine when viewed from the side. See Dorland's Illustrated Medical Dictionary, 1074 (32nd Ed. 2012).

There is no spondylolysis[17] or spondylolisthesis.[18] The disc spaces are within normal limits. There is no interval change when compared with 3/20/2009." Tr. 188.

Perez had an initial physical therapy evaluation on March 26, 2009. Tr. 192-201. Perez reported "pins and needles" horizontally along the lower back and vertically along the back of the right thigh. Tr. 193. It was noted that Perez was intact cognitively and emotionally and she was cooperative and had no behavioral needs. Tr. 195-196. Perez reported that her best pain level was a 5 on a scale of 1 to 10, her present pain level was an 8 and her worst pain level was a 10. Tr. 197. Perez stated that her pain was constant, she had pain at night and medications, heating pads and Bengay did not provide relief. Id. The evaluating physical therapist noted that Perez's range of motion of the bilateral lower extremities was grossly within functional limits except for the hamstrings; her bilateral lower extremity muscle strength was slightly diminished (4+/5); and her abdominal muscle

---

[17]A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. Spondylolysis is basically a stress fracture or breakdown of the components of a vertebra. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

[18] A spondylolisthesis is a forward slip of one vertebra relative to another. Id.

strength was diminished (4/5).[19] Tr. 198. Perez had tenderness and tightness over the bilateral lumbar paraspinal muscles. Tr. 199. Perez's sensation was intact to touch in the bilateral lower extremities. Id. Perez had an independent gait which was antalgic with a slow cadence and flexed hip posture but she could sit and stand independently. Id. She had a negative Faber's test,[20] a positive sacroiliac gap test on the right,[21] a negative sacroiliac compression test, a negative straight leg raise test on the left and a positive straight leg raise test on the right.[22] Id. The evaluator opined that Perez with therapeutic exercises and

_____

[19]"A 4/5 grade indicates that the muscle yields to maximum resistance. The muscle is able to contract and provide some resistance, but when your physical therapist presses on the body part, the muscle is unable to maintain contraction. . .  A grade of 4+/5 indicates that your muscle yields to maximum resistance, but was able to provide some resistance during the testing." Muscle Strength Measurement, Physical Therapy, About.com, http://physical therapy.about.com/od/orthopedicsandpt/a/strengthmeasurement.htm (Last accessed February 7, 2014).

[20]The Faber test or Patrick's test is a pain provocation test which reveals problems at the hip and sacroiliac regions. Faber is an acronym which stands for flexion, abduction and external rotation.

[21]This test can suggest a problem with the integrity of the anterior ligaments of the sacroiliac joints.

[22]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed February 7, 2014).

ultrasound therapy would have a good rehabilitative potential. Tr. 199 and 201.

Perez had physical therapy sessions on March 27 and 30, and April 1, 3, 6, 8, 10, 14, 15, 17 and 22, 2009.  Tr. 202-212. On April 1st Perez reported minimal pain but pins and needles in her legs. Tr. 203. The therapist stated that Perez tolerated the therapeutic exercises well. Id.  Perez pain level on April 3rd was a 2 on a scale of 1 to 10 and she again tolerated the exercises well. Id.  At the appointment on April 6th Perez stated her pain level had increased to a 7. Tr. 204.  Her pain was a 4 at the appointment on April 8th, a 2 on April 10th, a 7 on April 14th, a 5 on April 15th, a 6 on April 17th, and an 8 on April 22nd. Tr. 204-207.  It was consistently reported that Perez tolerated the exercises well. Id.

On April 10th, Perez also had an appointment with Mohammadre Azadfard, M.D., regarding her low back pain. Tr. 220-222. Dr. Azadfard found Perez ambulatory. Id.  Perez rated her back pain on that day 10 out of 10 which was inconsistent with what she had told her physical therapist that same day. Id.  The results of a physical examination were essentially normal including when Dr. Azadfard examined her back she had no point tenderness and a negative straight leg raising test. Tr. 222.  Also, Perez had no focal motor or sensory deficits, her deep tendon reflexes were normal (2+) and her gait was stable. Id.  Dr. Azadfard did state

17

that Perez had range of motion of the back limited in all directions without specifying the degree of limitation. Id. Dr. Azadfard prescribed pain medications, referred her to pain management and ordered an MRI of Perez's lumbar spine. Id.

On April 27, 2009, Perez requested that Dr. Lopez or Dr. Azadfard write a "medical necessity" note that she could send to her utility company in the hope that it would turn her electricity back on. Tr. 220. Those physicians declined to do so because pain did not represent a life-threatening illness. Id.

Perez was discharged from physical therapy on April 28, 2009. Tr. 190. In the discharge summary it was stated that Perez had demonstrated improvement in the level of functioning, independence or quality of life but the therapy did not achieve the goal of reducing her pain at the worst to a 5 on a scale of 1 to 10. Tr. 190. Perez did have partial improvement in hamstring range of motion and lumbar flexion. Id. The reason given for discharge was that Perez's prescription for physical therapy had expired. Id.

After being discharged from physical therapy, Perez sought and received no care for several weeks. Her next medical appointment was on May 18, 2009, with Christopher Castro, D.O., at which she complained of low back and right leg pain. Tr. 226-227. Perez stated her pain was constant and rated it as an 8 on a scale of 1 to 10 Tr. 226. She complained of difficulty sitting, standing, bending, walking and driving and that the pain radiates

into both posterior thighs and to the distal right calf. Id. She complained of numbness in the bottom of the right foot but denied any weakness. Id. A physical examination performed by Dr. Castro revealed that Perez was alert and oriented, in no acute distress, with an independent gait and she used no ambulatory assistive device. Id. Range of motion in Perez's spine was limited, though Dr. Castro observed only mild tenderness over her lumbosacral spine and no other significant tenderness. Tr. 227. Heel and toe walking[23] was intact but painful on the right side. Id. Sensation was diminished in a right L2 distribution or dermatome versus the left.[24] Id. Perez had a positive straight leg raising test on the right. Id. Dr. Castro's diagnostic assessment was that Perez suffered from low back and right leg pain as the result of probable

---

[23]The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc.,https://www.mls-ime.com /articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed February 6, 2014).

[24]A dermatome is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatome. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape Reference, http://emedicine.medscape.com/article /1878388-overview (Last accessed February 7, 2014). Subsequent MRIs did not reveal any problem with Perez's lumbar spine at the L2 level. Tr. 213.

S1 radiculopathy.[25] Id.  He also found that she had a "concommitant lumbar sprain/strain." Id.  Dr. Castro scheduled Perez for a right S1 epidural steroid injection, ordered an MRI of the lumbar spine, advised Perez to quit smoking cigarettes, and noted that he believed additional medications were warranted. Id.

The MRI was performed on May 19, 2009, and revealed a central disc protrusion at the L5/S1 level of the lumbar spine which caused moderate narrowing of her central spinal canal but no neuraforaminal stenosis, and a minimal posterior central disc bulge with annular tear at L4/L5.[26] Tr. 214.

On June 1, 2009, Perez had an appointment with Ira Vohra,

---

[25]Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed February 6, 2014).

[26]The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance. The inner core of the intervertebral disc is called the nucleus pulposus and the outer layer the annulus fibrosus. Jill PG Urban and Sally Roberts, Degeneration of the intervertebral disc, PublicMedCentral,http://www.ncbi.nlm.nih.gov/pmc/articles/PMC165040/(Last accessed February 6, 2014); see also Herniated Intervertebral Disc Disease, Columbia University Medical Center, Department of Neurology, http://www.columbianeurosurgery.org/conditions/herniated-intervertebral-disc-disease/ (Last accessed February 6, 2014).

M.D., regarding her low back pain. Tr. 238-241. Dr. Vohra observed Perez's antalgic gait and station and noted positive findings on straight leg raising but he found Perez well appearing and in no distress. Tr. 239-240.

On June 4, 2009, Dr. Castro administered an epidural steroid injection, after which Perez noted significant relief. Tr. 215 and 225. On June 29, 2009, Perez reported to Dr. Castro that her pain had returned and that it radiated to her left lower extremity. Tr. 225.  Dr. Castro administered another epidural steroid injection which Perez tolerated well with no complications, and he recommended that she return in six weeks. Tr. 225.

On July 30, 2009, Perez had an appointment with Lisa Tabbit, D.O., regarding her back pain. Tr. 236-237. The report of this appointment notes that Perez was ambulatory. Tr. 237.  The reported physical examination findings were normal except Perez had tenderness to palpation over the lower lumbar area and "decreased [range of motion] limited by pain and she "could not complete pelvic tilt test or seated flexion or standing flexion tests." Id. Perez's reflexes were intact and she had negative straight leg raising tests. Id.  The diagnostic assessment was "chronic low back pain." Id.  Dr. Tabbit prescribed the narcotic-like pain medication Ultram and the antidepressant amitriptyline.  Id.

Perez was a "No Show" at appointment with Dr. Castro scheduled for August 10, 2009. Tr. 235.

21

On August 12, 2009, Theodore Waldron, D.O., reviewed Perez's medical records on behalf of the Bureau of Disability Determination and concluded that Perez had the physical ability to engage in a limited range of light work. Tr. 228-234. Dr. Waldron opined that Perez could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand or walk 4 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; and could never climb ladders, ropes or scaffolds. Id. Dr. Waldron stated that Perez should avoid concentrated exposure to extreme cold, wetness, vibration and hazards but otherwise had no other functional limitations. Id. He further found Perez's subjective complaints of disabling symptoms only partially credible. Tr. 233.

On September 11, 2009, Perez visited the emergency department of the Wyoming Valley Health Care System complaining of lower back and left leg pain and decreased range of motion of the back. Tr. 303-305. She arrived at the treatment area ambulatory with a steady gait. Tr. 305. Perez had no numbness, motor weakness, bowel or bladder incontinence, abdomen pain, fever, tingling, dysuria (painful urination) or radiation of pain. Tr. 303. The severity of the condition was moderate. Id. The results of a physical examination were essentially normal other than symptoms associated with her lower back. Tr. 304. Perez had limited range of motion as a result of subjective complaints of pain; she had

22

paraspinal tenderness; and she had a positive straight leg raising test on the left. Id.  Perez had no motor or sensory deficits; she had normal deep tendon reflexes; and her gait was normal. Id. With respect to Perez's psychiatric condition it was stated that Perez was oriented to person, place and time; she had a normal affect; and she had normal insight and concentration. Id. The diagnostic assessment was low back pain (sciatica and lumbosacral strain) and Perez was discharged from the hospital in a stable condition with no recorded prescriptions.  Tr. 305.  Perez was advised to follow-up with her primary care physician. Id. At the time of discharge Perez was ambulating without assistance and it was stated that Perez was driving unaccompanied. Id.

        Perez again visited the emergency department on September 18, 2009, complaining of low back pain. Tr. 298-301. The symptoms complained of, physical examination findings, diagnosis and discharge instructions were essentially the same as those recorded on September 11th. Id. In fact the adverse physical examination findings were less than those recorded on September 11th. Id. The attending physician did not note any paraspinal tenderness or that her range of motion of the back was limited because of pain. Id. Perez was given a prescription for Ultram and Flexeril. Tr. 300. It was again reported that Perez left the emergency department ambulatory and that she was driving unaccompanied. Tr. 301.

        On October 5, 2009, Perez cancelled an appointment with

Dr. Tabbit. Tr. 236.

Perez visited the emergency department a third time on October 9, 2009 complaining of low back pain. Tr. 293-296. The symptoms complained of, physical examination findings, diagnosis and discharge instructions were essentially the same as those recorded on September 11th other than on this occasion Perez was referred to Carlo M. De Luna, M.D., a neurosurgeon, for an evaluation. Id. Also, during this visit the pain medications Ketorolac Tromethamine[27] and Percocet were administered to Perez by emergency department personnel. Tr. 295 -296. At discharged Perez was given prescriptions for Ultram and Prednisone. Tr. 295. Perez left the emergency department ambulatory without assistance but she was accompanied by a friend who was driving. Tr. 296.

On November 6, 2009, Perez was evaluated by Dr. De Luna. Tr. 344-345. After conducting a clinical interview and a physical examination and reviewing the lumbar MRI of May 19, 2009, Dr. De Luna's diagnostic impression was as follows:

> Ms. Perez presents with a history of intractable back pain refractory to conservative treatment that has led her to walk hunched over. Neurologically she has findings of a mild S1 radiculopathy manifested as an absent ankle jerk, but she also has strong findings of a left straight leg raising sign and no findings of a myelopathy. Her MRI from May shows a small disc bulge at the L4-5 that I believe may be causing some of her back pain. She has a larger

---

[27]This is a non-steroidal anti-inflammatory drug used to treat moderately severe acute pain for up to 5 days. Ketorolac, Drugs.com, http://www.drugs.com/pro/ketorolac.html (Last accessed February 8, 2014).

> disc herniation at the L5-S1, but it is oriented towards the right. I cannot fully explain why her symptoms are oriented towards the left. Regardless based on physical examination alone, she has chronic lumbar spasm, and the patient is unable to walk erect. I am concerned that she may have developed a permanent physiologic response to this pain.  I advised her to undergo a new MRI to see if her disc is changed. Potentially if it is pointing toward the left, she could undergo surgery to decompress the nerve root. I also advised her to undergo a CT scan to determine if she is suffering from a calcified disc as opposed to a soft herniation. Further recommendation will depend upon the results of her studies.

Tr. 345. An MRI of the lumbar spine was performed on November 11, 2009, which revealed in relevant part the following: "At the L5-S1 level, there is a large left-sided herniated disc noted. This impresses the thecal sac and the nerve root especially at S1 on the left."[28] Tr. 290.

Perez had a follow-up appointment with Dr. De Luna on November 25, 2009. Tr. 346-347. In the report of that appointment Dr. De Luna stated that the left L5-S1 herniated disc was consistent with the pain described by Perez in her posterior thigh and calf on the left. Id.  Dr. De Luna recommend that Perez have a left L5-S1 laminectomy and discectomy. Id.  Those procedures were scheduled for and performed on December 8, 2009. Tr. 349. Dr. De Luna performed the procedures and noted that the nerve root was completely decompressed and at the conclusion of the surgery the

---

[28]Oddly, in the impression section of the report of the MRI it is stated with respect to the L5-S1 level that there was "[n]o change since 5/19/2009." Tr. 291.  It was also stated that the bulging disc at the L4-L5 level with an annular tear had improved (regressed) since May 19, 2009. Id.

nerve root was free along its entire course. Tr. 350. An intraoperative x-ray showed that Perez's bones were in alignment without compression deformity. Tr. 352. Perez's condition after surgery was stable. Tr. 350.

The record reveals no postsurgical treatment until May, 2009, when Perez presented to Joseph Paz, D.O., complaining of back and left leg pain. Tr. 360. This is the last report of an appointment that we encounter in the administrative record and at that appointment Perez reported that surgery had helped "quite a bit" and although her pain had slowly returned, it was not as bad as it was before surgery. Tr. 360. Dr. Paz found Perez's lumbar range of motion decreased in all directions without specify the degrees of limitation, and he noted left paravertebral tenderness, an antalgic gait and a positive straight leg raising test on the right, but her muscle strength and tone were normal in her lower extremities, and she could stand on her toes and heels without difficulty. Tr. 361. Dr. Paz suggested additional epidural steroid injections, prescribed Lyrica, and instructed her to take Motrin. Tr. 362.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Perez had not engaged in substantial gainful work activity since April 13, 2009, the date Perez filed her application for supplemental security income benefits. Tr. 27.

26

At step two of the sequential evaluation process, the administrative law judge found that Perez had the following severe impairments: "degenerative disc disease of the lumbar spine; status post L5-S1 laminectomy and diskectomy[.]" *Id.* Perez has not challenged the administrative law judge's step 2 analysis.

At step three of the sequential evaluation process the administrative law judge found that Perez's impairments did not individually or in combination meet or equal a listed impairment. *Id.* Perez has not challenged the administrative law judge's step three analysis.

At step four of the sequential evaluation process the administrative law judge found that Perez could not perform her past relevant light to medium work as a warehouse worker, fast food worker, mail handler, file clerk and hand packer but that she could perform a limited range of unskilled, sedentary work which allowed her to sit or stand at will; avoid feeling, pushing or pulling with the left lower extremity to include the operation of pedals; and was consistent with the other restrictions imposed by Dr. Waldron. Although the ALJ relied on Dr. Waldron's assessment in setting Perez's residual functional capacity, she gave Perez the benefit of the doubt and reduced the exertional requirements to the sedentary level. Tr. 27-28.

In setting the residual functional capacity, the administrative law judge also reviewed the medical records and

27

considered Perez's credibility.  The administrative law judge found that Perez's statements about her functional limitations were not credible to the extent they were inconsistent with the above residual function capacity. Tr. 29.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Perez had the ability to perform unskilled, sedentary work such as a ticket taker, video monitor and telephone receptionist, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 31.

The administrative record in this case is 367 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an adequate job of reviewing Perez's medical history and vocational background in her decision. Tr. 25-32. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 11, Brief of Defendant.

Perez basically argues that the administrative law judge failed to adequately develop the record and failed to appropriately consider the medical evidence and as well as her credibility.  She further argues that the ALJ did not present all her limitations to the vocational expert and, therefore, the step five determination is not supported by substantial evidence. We have thoroughly reviewed the record in this case and find no merit in Perez's

arguments.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. § 404.1512(c).

No treating or examining physician has indicated that Perez suffers from physical or mental functional limitations that would preclude her from engaging in the limited range of work set by the administrative law judge in her decision for the requisite statutory 12 month period.[29]  No physician indicated that Perez was incapable of engaging in the limited range of work set by the administrative law judge on a full-time basis.

We discern no reason why the administrative law judge could not rely on the opinion of Dr. Waldron, the state agency physicians. The record does not contain any statement from a treating physician that Perez had physical limitations that would preclude her from engaging in work as a ticket taker, video monitor

---

[29]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

or telephone receptionist and the bare medical records do not provide support for such a conclusion.

With respect to Perez's argument that the administrative law judge did not properly consider her credibility or present all her limitations to the vocational expert, the administrative law judge was not required to accept Perez's claims regarding her physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed and heard Perez testify, the administrative law judge is the one best suited to assess her credibility.

Finally, with regard the Perez's argument that the administrative law judge did not properly develop the record, it is correct that an administrative law judge has an affirmative

obligation to develop the record.   Rutherford v. Barnhart, 399

F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454

(8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir.

2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also

Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the

ALJ's duty to investigate the facts and develop the arguments both

for and against granting benefits[.]").   If the record is not

adequately developed, remand for further proceedings is

appropriate.   Id.

In this case, however, we are satisfied that the

administrative law judge complied with her affirmative obligation

to develop the record.  Specifically, the administrative law judge

obtained Perez's medical records for the relevant period.  Also,

Perez was represented by an attorney during the administrative

proceeding and an attorney in the present appeal.   The attorney

gives no explanation why counsel who represented Perez during the

administrative proceedings did not contact Perez's treating

physicians for functional assessments prior to the administrative

hearing or requested an opportunity to obtain and submit such

assessments after the hearing.   Although counsel argues that the

ALJ should have obtained such assessments, counsel has not

proffered or produced any additional evidence from any treating

physicians.  Counsel also has an affirmative obligation to develop

the record on behalf of a client. It is inappropriate for counsel

31

to fail to do so and subsequently argue that a case should be remanded to the Commissioner for further proceedings because of the absence of a functional assessment from a treating physician.

Furthermore, an ALJ is only required to recontact a medical source if the evidence is insufficient for the ALJ to make a decision. 20 C.F.R. §§ 404.1512(e) and 416.912(e).  The evidence in this case was sufficient. The record contains a functional assessment from a state agency medical consultant, Dr. Waldron, who reviewed Perez's medical records. The administrative law judge's reliance on that assessment was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). The administrative law judge appropriately evaluated Perez's impairments and took into account Perez's functional limitations in the residual functional capacity assessment. In fact the administrative law judge gave Perez the benefit of the doubt and reduced Perez's residual functional capacity below the level found appropriate by Dr. Waldron.

We are satisfied that the administrative law judge appropriately took into account all of Perez's limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the

decision of the Commissioner is supported by substantial evidence.

We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the

decision of the Commissioner.

An appropriate order will be entered.